## Adams *against* Humes.

The maxim *caveat emptor* is inapplicable to a purchaser from a trustee, but he may set up a want of consideration, or any defect of title, as a defence to an action for the purchase-money, which he might set up to an action on a contract of sale by the beneficial owner; hence, in an action by an assignee in trust for the benefit of creditors, to recover the price of a tract of land held by the insolvent assignor under articles of agreement only, the defendant is entitled to defalcate in proportion to the purchase-money due by the assignor on the articles.

ERROR to the common pleas of *Centre* county.

Hamilton Humes, assignee of Dr John Plumbe, against David Adams. This was an action of debt upon a single bill for 616 dol-

lars and 66 cents, dated the 1st of August 1836, which was given in evidence. It appeared that the single bill was given in consideration of a tract of land sold by the plaintiff to the defendant, who gave in evidence the following agreements:—

16th of September 1836, agreement between Hamilton Humes and David Adams.

" Whereas David Adams has this day given his three single bills to Hamilton Humes, assignee of Dr John Plumbe, and a mortgage to secure the payment. Now it is perfectly understood that the execution and delivery of the said notes and mortgage are not to affect the right of the said David, if he has any such, to make a defence for the amount of money due the estate of General Philip Benner, on articles of agreement between Dr John Plumbe and Philip Benner, dated the 17th of May 1828; nor is the paper to affect the right of Humes to recover; but each party is to stand as if suit had been brought on the public bid made by Adams at the sale of the said property by the said assignee. Witness our hands and seals this 16th of September 1836."

17th of May 1828, article of agreement between Philip Benner and John Plumbe:

" Articles of agreement made this 17th day of May one thousand eight hundred and twenty-eight, between Philip Benner of the county of Centre, in the state of Pennsylvania, iron master, of the one part, and John Plumbe, of the same county, in the state aforesaid, of the other part, witnesseth that the said Philip Benner agrees to sell, and the said John Plumbe to purchase, a certain tract or piece of land situate in Rush township, in the county of Centre, in the state aforesaid, called Harfford, formerly in upper Bald Eagle township, Mifflin county, now Centre county, adjoining lands granted to Christian Lewboore, Hugh Patton, Robert Reed, and Levys, containing four hundred and thirty-three acres and one hundred and fifty-three perches, and allowance for roads. Surveyed in pursuance of a warrant dated the twenty-fourth of December, one thousand seven hundred and ninety-two, to Henry Pinkerton, and patented to Robert Morris the 9th of July 1794, and conveyed by deed poll, dated the 15th day of November 1803, by James Duncan, high sheriff of Centre county, to the said Philip Benner, together with the appurtenances, at and for the price, a sum of five hundred dollars, lawful money of the United States; and the said John Plumbe, for himself, his heirs, executors and administrators, shall and will well and truly pay unto the said Philip Benner, his heirs or assigns, the aforesaid consideration, a sum of five hundred dollars, lawful money aforesaid, in manner following, that is to say: one-third part thereof upon the execution hereof, and the remaining two-thirds, with interest from the date hereof, whenever the said Philip Benner can and will, by a good and sufficient deed, to be approved of by the said John Plumbe, convey the said tract of land in fee simple to the said John Plumbe; and the said Philip

[Adams v. Humes.]

Benner, for himself, his heirs, executors and administrators, doth covenant, promise and agree to and with the said John Plumbe that, if the title of the said Philip Benner should be defective or invalid, that he will repay and refund to the said John Plumbe, his heirs, executors, administrators or assigns, the said sum of money so paid at the execution hereof, with interest, by the said John Plumbe; but if the said Philip Benner should have a good and sufficient title to one-third part of the said land, that he will convey the same to the said John Plumbe, his heirs or assigns. For the true and faithful performance of the covenants aforesaid, the said parties do bind themselves, their heirs, executors and administrators, respectively each to the other, in the penal sum of two thousand dollars, firmly by these presents. In witness whereof, the said parties have hereunto set their hands and seals.

"Bellefonte, May 17th 1828, received of John Plumbe one hundred and sixty-six dollars and sixty-six cents, being the one-third part of the consideration money upon the above articles of agreement.

"$166 66.　　　　　　　　　　　　　PHILIP BENNER."

"Acknowledged, the 27th of November 1828, before Judge Burnside, and recorded on the 28th of November 1828."

30th September 1834, the land was sold to the defendant upon the following advertisement of Hamilton Humes, assignee of John Plumbe:

"Will be exposed to public sale by the subscriber, as assignee of Dr John Plumbe, at the court-house in the borough of Bellefonte, on Monday, the 24th of November next, the following described property, viz: five town lots situated in the town of Philipsburg, known by numbers 144, 145, 146, 147 and 148, on the plan of said town, together with a large two story brick dwelling-house, stabling, and other buildings thereon erected; also, an out lot adjoining said town lots, containing 5 acres and 135 perches; also, one other lot, marked number 54, situate in the town of Philipsburg, together with a large storehouse, a carpenter shop, &c., thereon erected; also, one other out lot, situate half a mile below the town of Philipsburg, containing 4 acres; also, one tract of land situate in Rush township, Centre county, together with a three fired forge, a frame storehouse and office, a two story dwelling house, and eleven workingmens' houses, smith shop, carpenter shop, stables, coal house, and all other buildings thereon erected; also, a tract of land situate in Rush township, Centre county, together with a saw mill and two dwelling houses thereon erected; also, a two story log tavern house and stabling adjoining, situate on the Bellefonte and Philipsburg turnpike, at the six mile run; also, another tract of land, situate in the towhship aforesaid, called Rockland, containing 407 acres and 138 perches and allowance, together with a saw mill and dwelling house, stabling and all other buildings thereon erected; also, two other tracts of land, situate in the township afore-

[Adams v. Humes.]

said, each containing 433 acres and 153 perches and allowance; also, parts of two other tracts of land, situate in Patton township, being that part of the old Craddock improvement which does not interfere with the claim of William M'Cay, Esq., of Sunbury.

"Where all those who wish bargains, and particularly the creditors of Dr John Plumbe, would do well to attend. A reasonable credit may be expected by those who purchase."

The plaintiff then gave in evidence the deed from him to the defendant for the land, which had been recorded.

Defendant's counsel requested the court to instruct the jury on this point:—

"That on this evidence and the legal construction of these papers and this sale, the plaintiff is not entitled to recover until he perfects the title of Philip Benner; and that the defendant is entitled to a defalcation for the amount due the estate of Philip Benner, on the article of the 17th of May 1828." Which instruction the court refused to give: "It is the opinion of the court, that *caveat emptor* applies to this sale; and that the defendant was bound to know the title he purchased, that a sale by an assignee excludes all warranty. Here the title was on record, which was constructive notice to the defendant which bound him, and that he is bound to adjust the title with Benner's estate; and that there is nothing in this sale or in these papers which entitles the defendant to a defalcation for any money due to Benner's estate."

To this opinion of the court defendant excepted.

Errors assigned:

1. The court erred in charging the jury, that the plaintiff could recover before he perfected the title to the defendant.

2. The court erred in stating that the maxim "*caveat emptor*" applied to the case trying, when part of the purchase-money was still due and owing by the plaintiff to General Benner, and of which the defendant had no notice until after the property was struck down to him.

*Burnside* and *Valentine*, for plaintiff in error, cited 1 *Serg. & Rawle* 438; *Sug. Vend.* 310.

*M'Allister* and *Blanchard*, for defendant in error, cited 9 *Serg. & Rawle* 162, 252, 397; 11 *Serg. & Rawle*, 138; 16 *Serg. & Rawle* 430; 2 *Penn. Rep.* 110; 3 *Whart.* 598.

The opinion of the court was delivered by

GIBSON, C. J.—This action, though brought on a specialty, stands by agreement of the parties on the purchaser's bid; and standing therefore as a bill to have the purchase executed by payment of the price, it is open to an equitable defence even at law. Now though the maxim *caveat emptor* is applicable, in such a case to patent defects in the quality of the estate, it is inapplicable to defects in the

title. Equity looks with such extreme jealousy on that, that it is the course of the English chancery never to compel a purchaser to pay for a title, unless it is so clearly marketable as to be free from a blemish that might be a hindrance to parting with it; and where there is nothing in the circumstances of the bargain, to show that less was treated for than a clear legal estate, less will not be forced upon him here. It is argued, however, that there is a class of cases in which the vendor is only an implement to effect the sale, and that being ignorant of the quality of the title, he sells, and the purchaser buys, just what the former owner had, and no more; in proof of which are cited our own decisions on the nature of our sheriff's sales, under the satutes for taking land in execution. But to say nothing of the special enactment, that the vendee shall have exactly what the debtor had, it would result from the nature of the office, that the sheriff is only an instrument, which the law uses to turn the debtor's estate into money; of the nature of which he is necessarily ignorant, and that, being directed to sell it for what it will fetch, he has no power to make conditions in respect to the title or the price of it. His vendee, therefore, takes it as he takes his wife, for better, for worse. It is certainly true, that the same principle was unnecessarily applied by Lord Rosslyn, in Pope *v.* Simpson, 5 *Ves.* 446, to a sale by a bankrupt's assignees. But as they are always put in possession of the muniments, and as they thus have an opportunity to become acquainted with the title they profess to sell, their sale is not to be distinguished from the sale of any other trustees; and we accordingly find that Lord Rosslyn's principle has been rejected by some of the most eminent equity judges that have sat in Westminster Hall. In White *v.* Foljambe, 11 *Ves.* 345, Lord Eldon entered a formal protest against it; "That assignees under a commission of bankruptcy," said he, "may sell under a special contract such estate as the bankrupt had, I admit. But if the assignees exhibit to sale a freehold estate of inheritance, not marking by the contract, that they mean to sell nothing more than it shall turn out the bankrupt had, the agreement is to sell the inheritance free from incumbrance, and (I except a lease which falls within this case) there is no principle which protects the assignees if they do not inform themselves before they propose a sale, what is the real nature of the title. Proposing an estate on terms which, if used by any other person, would be taken to tender a freehold estate of inheritance, free from incumbrances, they cannot say that it is not what they meant to tender. I agree to that case, (Pope *v.* Simpson,) if it means only this; that if they offer to a purchaser a freehold estate, free from incumbrances, and before the contract is executed, it appears to a court of equity, that the assignees cannot make such a title, the court of equity ought to leave the parties to law. The assignees, when they make a title, only covenant that they have not encumbered; but that does not prove that they did not mean to sell the fee simple, and they are only in the same situa-

[Adams v. Humes.]

tion of other persons who, having tendered a fee simple to sale, find they have been mistaken in the title; and in that case the court would say they should be left to law. The proposition is very different, that where the assignees of a bankrupt expose to sale an estate of inheritance, they are not bound to inform themselves as diligently, and bound by the contract as much, as any others." I have extracted these remarks entire, not more for the great authority of the quarter whence they come, than for their explicitness and good sense. The substance of them has been repeated in M'Donald v. Hanson, 12 *Ves.* 278, by Sir William Grant: "If assignees in bankruptcy," said he, " choose to advertise that they have not good title, or that they will sell only such title as they have, that is another thing. But if they advertise in the common way, there is no reason why they should not be bound as other persons." And it will be found in Spurrier v. Hancock, 4 *Ves.* 667, as he truly observed, that Lord Alvanley had no conception that assignees are entitled to any peculiar indulgence. Yet, as a commission of bankruptcy has been called a statutory execution, their office bears more resemblance to the office of a sheriff, than does that of assignees under a voluntary assignment for the benefit of creditors, or than that of any other trustees. Finally in Deverell v. Lord Bolton, 18 *Ves.* 512, Lord Eldon again adverted to Pope v. Simpson, and adhered to what he had said in White v. Foljambe. After decisions so direct, and by men so eminent, there is little doubt of the principle on authority, and there is as little doubt of it in reason. Every trustee to sell has the muniments and ample opportunity to learn the nature and circumstances of the title. If it is imperfect or encumbered, it is easy to offer it for what it will fetch as it stands. Bidders for an uncertainty may not be found; but open dealing is not to be dispensed with for the dishonest purpose of putting the estate into the hands of a purchaser at a higher price; and it was justly remarked by Lord Eldon, in Deverall v. Bolton, that a court of equity gives no encouragement to such a purpose. If, however, it is found that the estate can be better sold on general terms, it will be easy to change the plan; but in either way, every thing should be avoided which might lead to misconception, and when trustees omit the necessary precautions against it, they have no room to complain that they are held to the terms of an ordinary sale. It would be difficult to find a reason for the notion of Lord Rosslyn. That a purchaser may not call on a trustee for a covenant of title, is because it would be neither just nor politic, to require a vendor to warrant a thing, in which he has not a personal interest. No man would accept the office of a trustee, if it might place him in that predicament. Being answerable for nothing but unfair dealing, he is bound only to warrant that he has not encumbered the title, and to have refrained from positive misrepresentation. But in order to deal fairly, he is bound to acquaint himself with the title, and to sell the estate as the beneficial owner of it would sell it. In the case at

[Adams v. Humes.]

bar, there was no saving of any thing. The estate was proposed in the advertisement, merely as a tract of land situate in a particular township and containing so many acres. Not a word was said about an outstanding price of a former purchase. As a vendee by articles, the insolvent assignor had only an equity, the title having been withheld as a security for the purchase-money; and his assignee's vendee has a right to have a clear legal title, or in its stead, a deduction equal to the sum it will cost to procure it; and of that he was deprived by the direction.

Judgment reversed, and a *venire de novo* awarded.